IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 04-119 (EGS) |
| | : | |
| MOHAMED ALAMGIR, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant Mohamed Alamgir is scheduled to be sentenced on November 21, 2006, upon his plea of guilty to a criminal Information charging him in one count with engaging in a conspiracy to commit Labor Certification and Immigration Fraud (18 U.S.C. §371), 159 counts of substantive Labor Certification and Immigration Fraud (18 U.S.C. §1546(a)), and four counts of Money Laundering (18 U.S.C. §1956). The statutory maximum sentence of imprisonment on the conspiracy count is five years on the conspiracy count, ten years on each substantive fraud count, and twenty years on each money laundering count. The statutory maximum fine is $250,000 on each of the conspiracy and substantive fraud counts, and $500,000 on each money laundering count. Both parties have agreed to the United States Sentencing Guidelines calculations utilized in the Presentence Investigation Report (PSR) which correctly compute the defendant's Total Offense Level to be 27 (after a two-level reduction for Acceptance of Responsibility and an additional one-level reduction for which the government hereby moves pursuant to U.S.S.G. §3E1.1(b)), and the resulting sentencing range to be 70-87 months of imprisonment.

The defendant entered his guilty plea on April 23, 2004, pursuant to a written plea agreement, and at that time also stipulated to a factual proffer supporting the pleas. He was

remanded into custody from April 23, 2004, to June 3, 2004, at which time he was released on bond. His bond was revoked on October 29, 2004, and has remained incarcerated to the present. Thus, he will have served approximately 26 months in custody by the time of his sentencing.

The purpose of this filing is (1) to urge the Court to apply, as advisory, the Guidelines calculation on which the parties and the Probation Office have agreed, (2) to request that the Court grant a third-level reduction for Acceptance of Responsibility pursuant to U.S.S.G. §3E1.1(b), and (3) to request that the Court order that any unpaid money owed by the defendant to the United States be paid as a condition of his supervised release. The plea agreement contemplates the possibility that the government would move for a downward departure for substantial assistance, pursuant to U.S.S.G. §5K1.1; the government expects to be in a position to have determined whether to make such a motion by the time of its November 16, 2006, reply to the defendant's sentencing memorandum.

### The Court Should Apply the Guidelines Calculation, as Recommended by Booker

The Court can and should apply the stipulated Sentencing Guidelines calculation, even though it is no longer mandatory to do so, and accordingly should impose a sentence within the applicable Guidelines range.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 542 U.S. 296 (2004), and consequently invalidated the statutory provision that made the Guidelines mandatory: 18 U.S.C. §3553(b)(1). Booker, 543 U.S. at 244. However, the Court expressly declined to invalidate the Guidelines in their entirety, and instead declared the remainder of the Guidelines to be the most appropriate

benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for imposing a sentence different from that provided for in the Guidelines. See 18 U.S.C. §3554(c)(2). Such a sentence will then be subject to appellate review for its "reasonableness". Booker, 543 U.S. at 765.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing". Booker, 543 U.S. 264 (citing 18 U.S.C.A. §§3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – as well as the continued requirement that the sentencing court explain in writing the basis for a sentence that falls outside of the Guidelines range, and the new "reasonableness" standard of review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guideline range presumptively reasonable, but it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines – intended to achieve the uniform and appropriate treatment of like crimes – represent the distillation of two decades of careful study of sentencing practices across the country, and closely correlate to the varying severities of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the

relevant sentencing considerations set forth in §3553(a). These considerations include, among others: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; © to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See United States v. Coles, 403 F.3d 764, 766 (D.C. Cir. 2005).

Indeed, the Sentencing Commission formulated the Guidelines only after first canvassing prior sentencing practice and undertaking to identify and assign weights to all the factors – aggravating and mitigating – that judges had long traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. §994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, in the two decades since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns". Booker, 543 U.S. at 263; see id. at 264 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by the sentencing court.  This view is shared by Congress and the Supreme Court.  As every Supreme Court Justice in the various opinions in Booker recognized, the Guidelines embody the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 253 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 750 (same) ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at 292 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 303-04 (dissenting opinion of Scalia, J.) ("[T]he primary objective of the Act was to reduce sentencing disparity.").

Booker does depart from the prior practice of automatic reversal that would have resulted from the failure to sentence a defendant within the Guidelines.  Such a sentence will now be reviewed instead for its "reasonableness".  See Booker, 543 U.S. at 261.  Nevertheless, the Guidelines – resulting as they do from years of study of sentencing practices, crime statistics, and national crime policy, and of careful consideration of the factors that inform sentencing, see 18 U.S.C. §3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable.  Booker does not allow courts to substitute their individual judgment about the appropriateness of the Guidelines range without justifying why their sentence takes the case

outside of the heartland of situations already contemplated by the Guidelines.  See 18 U.S.C. §§3553© (mandating consideration of the Guidelines) and 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances.  This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, a court should "give heavy weight to the recommended Guidelines sentence in determining what sentence is appropriate" and "[i]n the exercise of its discretion . . . only deviate from those Guidelines in unusual cases for clearly identified and persuasive reasons".  Id. at 925.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, all the facts supporting the proposed sentence have been admitted to by the defendant – and, indeed, in every respect the Guidelines calculation has been stipulated to by him. Moreover, as made clear in the PSR, there exist no unusual circumstances that would warrant an

exception to the preference for Guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant within the Guidelines range.

### The Seriousness of the Defendant's Offense is Properly Reflected in the Guidelines Calculation

The agreed-upon Guidelines calculation in this case properly takes into consideration the seriousness of the criminal conduct to which the defendant has pled guilty. The scheme is set forth in the Information to which the defendant pled guilty, the factual proffer to which he subscribed, and the Presentence Investigation Report to which he has lodged no objection.

The magnitude of the impact of the defendant's offense conduct bears noting, however. Using his elevated status as a respected member of a largely immigrant community, and the skills he attained and position of trust he occupied as an attorney practicing immigration law in the District of Columbia, Mohamed Alamgir perverted the lawful processes of the United States immigration system to reap millions of dollars in illegal proceeds over a period of years. In so doing, he enlisted scores of men and women – including friends and family, and independent business-owners – to facilitate his illicit enterprise by falsifying official documents, laundering illicit proceeds, and otherwise acting as willing coconspirators in the scheme. A dozen of those coconspirators have pled guilty to their roles, and two await trial.

A particularly grave harm wrought by Mohamed Alamgir's illegal enterprise is the manner in which it undermined the integrity of the United States visa-issuance processes that were then in effect. Those processes relied on the honesty of persons applying for legitimate employment-based visas, and other persons filing documents in support of those applications. In the face of the large-scale fraud perpetrated by Mohamed Alamgir, lawful applicants cannot but have doubted

that their honest efforts to obtain immigration status would be fruitful.  The people of the United States, as well as foreign nationals who would seek to legally enter and remain in the United States, have a right to have visa-issuance rules applied fairly and properly, and Mohamed Alamgir trampled on that right.  Moreover, when the controls built into the visa-issuance process are evaded – when, in effect, immigration status can be "bought" from an attorney willing to process bogus visa application documents – there is grave risk that persons having harmful motives may make their way into the United States.

Under the Guidelines, in this case, the applicable sentence calculation is based on the money laundering charge predicated on trafficking in more than 100 immigration documents.  The base offense level applicable to that violation in this case is appropriately high – 20 –  because the offense conduct was widespread and had the effect both of corrupting the United States immigration process and abusing the financial institutions system.  Because the offenses to which he has admitted include money laundering of a particularly sophisticated nature, the 4-level increase is justified.  An additional 4-level increase is applicable because the offense involved five or more participant.  Finally, because the defendant abused a position of trust, his conduct warrants a 2-level increase.

Notwithstanding this, the defendant's early admission of his culpability, and agreement to enter a guilty plea and cooperate with the government, clearly entitle him to the full 3-level reduction available under such circumstances.

### Financial Penalties

The government and the defendant agreed that he would submit to criminal forfeiture of the property described in the criminal allegations set forth in the Information, as well as the sum

of $2,000,000. The majority of that sum remains unpaid, although the defendant through counsel has been working with the government to arrange for its payment. To the extent that funds remain unpaid at the time of sentencing, the government will request that they be ordered paid as a condition of the defendant's supervised release.

## Conclusion

For all the foregoing reasons, the United States respectfully requests that the Court: (1) accept as advisory the Probation Office's calculation of the Sentencing Guidelines applicable to the defendant, (2) grant the government's motion for a third-level reduction pursuant to U.S.S.G. §3E1.1(b), and (3) order that any unpaid money owed by the defendant to the United States be paid as a condition of his supervised release.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar # 498610

By:

Laura A. Ingersoll, Assistant United States Attorney
Connecticut Bar # 306759
National Security Section
United States Attorney's Office
555 4th Street, N.W. – Room 11-844
Washington, D.C.  20530
202/514-9549
Laura.Ingersoll@usdoj.gov